HENRY K. MOSS vs. RICHARD DAVIDSON et al.

Amendments should be freely and liberally allowed to the very moment of trial. Quere—Should the rule be extended beyond this limit?

A complainant, who purchased property, received a conveyance, and has taken and enjoyed undisturbed possession, must, in his bill, show clearly the defect of title, or fraud which he alleges to exist, before a recision of the contract will be granted.

The statute of 1822, requiring deeds respecting the title of personal property to be recorded in that county in which such property shall remain, and declaring all such deeds void as to all purchasers for a valuable consideration, without notice, and as to all creditors, when such property be removed into a different county, and the deed be not recorded there within twelve months from the date of such removal—applies to marriage contracts which pass the title of personal property.

If a purchaser, at any time before the payment of the purchase money, receives notice of an outstanding title, which the party who holds it desires to enforce, he will be affected by it, and he may be relieved from his contract; but if the party in whom the outstanding title is alleged to be, not only disclaims any interest, but actually relinquishes all right to the property which the purchaser bought—a court of equity will not rescind the contract.

APPEAL from the superior court of chancery.

On the 24th day of June, 1840, Moss filed his bill—stating that he, on the 29th February, 1836, bought of Davidson a plantation and negroes, paid the purchase money down, except $46,589 $\frac{69}{100}$, for which sum he gave his two bills of exchange, drawn on Byrne, Hermon & Co., one for $6,000, and one for $5,647 $\frac{50}{100}$; the first payable 1st January, 1837, the other, 1st March, 1837, and three promissory notes payable to Davidson on the first days of March, 1838, '39, and '40, each for $11,647 $\frac{40}{100}$. And that to secure the payment of said bills and notes, he gave a deed of trust to William H. Shelton, James Y. McNabb, and Etheldred May, on the plantation and negroes aforesaid. The bill charged that the deed of trust was never signed and executed by Davidson and May, and that May never assented to take under it; that it was acknowledged by Moss and wife, and Shelton, but not by the other trustees, and that on this probate

alone it was recorded in Rankin county; that Davidson agreed, in express terms, before the sale of said negroes, to warrant them sound; and if such warranty was not inserted in the deed, it did not carry out the agreement of the parties, and was omitted by mistake.

The bill charged, "that after the execution of the agreement for the purchase, the complainant took possession of the plantation and negroes, and from time to time paid sums of money on it, until there is now but one payment of $11,647 $\frac{40}{100}$ due, which fell due 1st March, 1840, and is yet unpaid except as is hereafter mentioned; that, after taking possession of the negroes, he first discovered the warranty was false as to two of them, Lewis and Rose, who were both unsound at the time of sale, and neither of them ever did any material service since, and were not worth their support. Lewis died crazy, and Rose is still unsound; and that said Davidson, before he required more money to be paid on said note, should allow him a credit for the prices and expenses of both Lewis and Rose; that said deed of trust was incomplete in its execution, and Davidson had no right to enforce it. That Davidson was attempting to sell under it, and had inserted an advertisement in the Mississippian, for the sale of a portion of the negroes, on the 25th of April, 1840, and that the advertisement purports to be signed by all the grantees in the deed of trust; that he believes, from an inspection of the manuscript, that it was not signed by them, but by Davidson's counsel, and that May never gave Davidson any right to sign his name to any such manuscript, or to make said advertisement in his name, and alleged that as there was no authority from one of the trustees, a sale cannot be made by the others; that there is no authority given in the deed of trust to sell any of the slaves in the event of default in payment, but, in such an event, it authorizes a sale of the land only, as the term used in the deed was "premises," which can only apply to land. And that, if this court does not interfere, Davidson will sell without giving him credit for the unsound negroes—and prays that Davidson, Shelton, and McNabb be made defendants, and that a decree may be rendered to ascertain the value of the negroes, or such

damages as he had sustained by the false warranty, and the amount when ascertained, deducted from the balance due on the note aforesaid; that Davidson be restrained from selling under the deed of trust until the trustees join in the same, and if it be necessary to sell only a part of the property, that the trustees be confined to the land as provided for by the deed, and if mistaken in the relief asked, such other relief as the nature of the case required," was prayed for.

The answer of Davidson (filed 28th Dec. 1840) admitted that on the 29th February, 1836, Moss and wife gave a deed of trust on certain land and negroes, as stated in the bill, to secure the payment of certain moneys therein mentioned, all of which have been paid, except the last instalment for $11,647$\frac{40}{100}$, with interest from 1st March, 1840, which is wholly unpaid; that the deed of trust and notice of sale are believed to be correctly exhibited with the bill, and the statements of the bill are substantially correct, but the bill does not state that, when the sale was made, respondent gave to complainant a statement, in writing, of the qualities and conditions of the negroes sold, to the best of the knowledge he then had, nor has he ascertained any mistake therein; that, the two negroes particularly complained of, Lewis and Rose, he had owned but a short time, and was, therefore, not as able to judge of them as he was of the others, but as well as he recollects, he represented that Lewis was not of a good disposition, though sound in mind and body; that Rose appeared delicate, which caused some doubt whether she was healthy; denied that there was any fraud practiced as to these two negroes, or any other portion of the property, for he took great care to make a full exposition, so as to preclude all cause of subsequent complaint; nor had he ever heard any complaint, either directly or indirectly, about the said negroes, or any other part of the property, until the filing of this bill.

And although a hope was expressed in the bill that defendant would not press the collection of the money until this matter was settled, yet he never had any intimation of it, or opportunity for such settlement, but from the tenor of complainant's conduct, he was led to believe that no cause of complaint existed,

Moss *v.* Davidson et al.

in proof of which, he filed a letter of complainant's, written after he had used the property for two crops, in which he says he would not sell the negroes, and intimates no objection to any of them; which letter was written in answer to one from respondent, proposing a repurchase of said property. In further negation of this part of the bill, the answer averred that complainant proposed a sale of the same property to William H. Shelton, and furnished a list of the negroes, with their estimated value, in which he valued Lewis at $1500, and Rose at $1000; and this was late in the second year after his purchase, which appears in the list itself, which was filed, with the affidavit of said Shelton attached; that soon after this, Shelton made inquiries of respondent, of the valuation, and thus he obtained information of its existence. The answer further averred, that the trustees all indicated a willingness to act, and none of their names were used without authority; that said May is now at a distance, but long ago approved of his name as a trustee, and no doubt would now attend to this matter if specially called on; that the other two trustees reside near complainant, and are ready and willing to act, having given express consent for the advertisement exhibited with the bill. Respondent further states that, on or about the 15th of March last, complainant applied to him and requested him not to advertise the property till the 20th of April, 1840, by which time he would be able to pay the money, and said if he did not get the indulgence asked, he could get an injunction, and might take the case to the high court of errors and appeals, and obtain much time; that upon these considerations he granted the indulgence, and did not advertise until the 24th of April, 1840, when the advertisement was made as exhibited in the bill; that this was in the presence of a counsellor, now one of the solicitors of the respondent; he had hoped that in consideration of the indulgence, even after the advertisement, the money would be paid without a sale, and that if a sale was necessary, it would not be prevented by complainant; that complainant had pursued an evasive course till the day before the sale, when, as respondent was informed, application was made to the judge of a circuit court, and an injunction obtained; that complainant de-

layed giving an answer to one of the trustees, whether he would give up the negroes for sale, as he is informed by said trustee, McNabb; that the assurance of paying at the necessary time for advertising, postponed the day of sale, so that an opportunity was afforded for getting this injunction at so late a day of the chancery court, that it could not be dissolved during that term, and that since the commencement of this term he has threatened to file a supplemental bill, pretending to doubt the title to part of the negroes sold him, which doubt is raised on a marriage contract between this respondent and his present wife, and that on hearing this information, he obtained a certified copy (not knowing where the original was) of said marriage contract, from Jefferson county, where it is recorded, and that respondent and his wife executed and acknowledged a deed of sale of such negroes as are embraced in that contract, and were included in the sale to complainant, and that also he procured a deed confirming the sale of said negroes to complainant, from his only children, who are over twenty years old, and these deeds, being from the only persons living in whom any present or contingent interest could be, he caused to be tendered to complainant, who refused to accept them.   Respondent prays that this may be taken as a cross bill; and afterwards as an original bill to secure the property and ensure the final execution of the trust; and that some one of the trustees, or some other proper person, be appointed a receiver to manage the property, subject to sale under said deed of trust, according to the terms of it, or of such terms as the court may direct, &c.; that said Moss be enjoined from removing any of the personal property from Rankin county, where it now is, and that he and his agents be enjoined from interfering with any of said property, so as to prevent said trustees, or either of them, from taking possession under the deed of trust, and holding the same subject to its provisions.

On the 30th of December, 1840, complainant filed an amended bill, which states that after filing his original bill, he discovered that defendant, Davidson, at the time of sale, had no right, or title, or power to sell eighteen of the *slaves* purchased by him as aforesaid—which were valued, at the time of the contract, at

$11,000 ; that Davidson only held them by virtue of a marriage contract between himself and his wife, executed prior to their marriage, by the provisions of which, the slaves were held by Davidson in trust for the use of Isabella, his wife, during her life, and then for the purposes mentioned in the deed ; that under no circumstances, had he, Davidson, any title or right to them ; that he could have acquired no right or title in them which he could have sold, unless Isabella had died in his lifetime, without children alive at that time ; that the said Isabella was then and still is living, and there were four children at that time of said Davidson, to wit—Sarah, who married Etheldred May, Caroline, Felix G. and Samuel F. Davidson, by another wife ; that said Davidson, when making this contract, and after it was made, concealed the existence of the marriage contract, and represented himself as the owner of said slaves ; that complainant would not have purchased them if he had known of the marriage contract, as Davidson was in ill health and is so still ; that his concealing the marriage contract and claiming the slaves as his own, was fraudulent ; that he had no knowledge of the marriage contract until the filing of his bill ; that one of the negro women died, and two children have been born out of the slaves mentioned in the marriage contract since the sale ; that Davidson has, within a few weeks, tendered deeds of himself, and his wife and children for said slaves, which he declined receiving, as he considers himself entitled to a rescission of the contract as to the said eighteen slaves, on account of said fraud and concealment.

Davidson's answer to the supplementary bill, (filed December 30th, 1840,) states that it re-asserts the allegation of the answer to the original bill—denies that he was guilty of fraud in not disclosing the marriage contract, as he had been informed that it was inoperative as to the right of said property—he regarded it as a matter of indifference ; that no thought of it was in his mind when he sold said property to Moss ; that he has never since regarded it as any difficulty in the title, but to quiet all complaint he procured and tendered the deeds exhibited with his answer and cross bill, which, with the warranty in the deed of sale he is advised, preclude all controversy as to the

title; that he thinks the aggregate price of the said eighteen slaves was $11,500, instead of 11,000 as stated in the amended bill, though he regards that as unimportant. He prays that the answer and cross bill heretofore filed, together with this answer, be taken as a complete answer to complainant's original and amended bill, and as a cross bill thereto, with all the parties named in the pleadings; that the contract may be specifically executed according to its terms, and that the injunction be dissolved, and the property placed in the hands of the trustees; or, if necessary, that a receiver be appointed.

On the 2d of January, 1841, Moss filed an amendment to his original and amended bills, stating, that since he has owned the land named in the original bill, he has greatly improved it and added to its value; and he asks an account of the improvements, and that said contract may be cancelled and rescinded entirely, unless he can have a rescission for the value of the slaves included in the marriage contract.

Upon these pleadings the defendants moved to dissolve the injunction, and for the appointment of a receiver; which motion the chancellor overruled, and the defendants appealed to this court. At the January term, 1841, this court reversed the decree of the chancellor, overruling the motion to dissolve the injunction—ordered the injunction to be dissolved and the cause remanded.

On the 13th of July, 1841, Moss filed a supplemental bill recapitulating the various allegations and charges contained in the foregoing pleadings, and charging further that the negroes mentioned in the marriage contract, owing to the great change in the circumstances and condition of the country, were not now worth more than one half of the price at which they were estimated at the time he purchased them as aforesaid; that, having omitted to make this allegation in his previous pleadings, this court, on that ground, reversed the chancellor's decree sustaining the injunction heretofore granted; that the omission arose from the opinion of counsel that the allegation was immaterial, and concludes by praying an injunction and as in his former pleadings. Upon this supplemental bill another injunction was grant-

Moss *v.* Davidson et al.

ed by the circuit judge, which was dissolved on motion at the December term, 1841; and from the decree of the chancellor, dissolving this last injunction, the complainant prayed and obtained an appeal to this court.

*W. Yerger,* for appellant.

The facts of this case are as follows : Davidson sold a tract of land and slaves to Moss for a large sum of money, payable by instalments, and took a deed of trust to secure payment of the purchase money. All the instalments but the last have been paid. Moss filed a bill to enjoin a sale of the property to pay it, and the injunction was granted. It is admitted that the allegations in the original bill are not sufficient to perpetuate the injunction. Afterwards Moss filed an amended bill, in which he stated that at the sale, Davidson represented that he had a good title to the slaves sold ; but that since the original bill was filed, he had discovered that he had no title to eighteen of the slaves ; that he held them merely as trustee for his wife and children, by virtue of a marriage settlement duly recorded. Davidson admits the concealment of the marriage settlement, but says that he did not design to commit a fraud in doing so, because he forgot it was in existence, and did not think it was worth any thing, as he had been so advised by counsel. He also tendered a deed of release from his wife and children, which he makes a part of his answer. Upon this state of facts, the chancellor refused to dissolve the injunction. Davidson appealed, and the high court reversed the chancellor's opinion, upon the ground that Moss had not shown any damage by reason of the concealment of the marriage settlement, nor did he aver that there had been any change in the value of the property, and, consequently, although Davidson's conduct was confessedly fraudulent, yet as no actual damage was shown, nor any change in the value of the property, the injunction should be dissolved, inasmuch as Davidson then tendered a deed conveying a valid title. Since then, Moss has filed a supplemental bill, stating that since the contract was made, a very material change had taken place in the value of the property, and that it has depreci-

ated nearly two thirds in value.   A supplemental injunction was granted on this bill, which the chancellor dissolved, and from this order Moss has brought the case, by appeal, to this court.

When this case was heretofore before this court, it was decided that the conduct of Davidson was fraudulent in concealing from Moss the existence of the marriage settlement.   It was also held that the statement in the answer, that the party had no recollection of the fact, constituted no answer to the charge of fraud and concealment.   This position is sustained by reason and authority.   5 Howard, 673.   10 Vesey R. 475.   7 Johns. Ch. R. 200.

Fraud vitiates every contract, and avoids it *ab initio*, both at law and in equity, and wherever a contract is fraudulent in fact, exhibiting moral turpitude in the party who procured it to be made, it is absolutely void, not voidable, and incapable of confirmation.   Chitty on Contract, 679.   5 Greenleaf R. 127.   4 S. & R. 483.   1 Wilson R. 320.   3 Peters' R. 210.   2 Vesey, Jr. 155.   Newland on Con. 497.   Ib. 252.   1 P. Willms. 240.   1 Jac. & Walker, 120.   1 Bro. c. c. 546.

At any rate, if there be any election to confirm it, by any subsequent act, that election must reside in the party defrauded, not in the party committing the fraud.

A vendor without title at the time of sale, or without the power to acquire title in the ordinary course of law or equity, cannot compel the vendee to take his after acquired title.   Sugden on Vendors, 251, top page.   3 Eq. Cases, abr. 680.

In the opinion which Judge Trotter delivered in this cause; when it was heretofore before this court, he has attempted to liken it to that class of cases in which a court of equity has permitted a party who had no title at the sale, to perfect it at the hearing, upon the admitted maxim that, as a general rule, " Time is not of the essence of contracts."

, With all deference to the opinion of the judge, it seems to me he has mistaken the extent of the rule in two particulars.   First in applying it to a contract for slaves ; secondly, in extending it to a contract admitted to be fraudulent, and also executed.   Time is of the essence of all contracts in which, from the subject mat-

Moss *v.* Davidson et al.

ter of it, the article agreed to be sold, is liable, from the nature of it, to frequent fluctuations in value. 1 Cond. Eng. Ch. R. 302. 5 Cond. Peters' R. 165.

An examination of the cases cited by Judge Trotter, will show, that in every case, the contract was made in good faith by the party who was permitted to perfect the titles at the hearing. If, however, it be admitted, that the principles decided by Judge Trotter apply to a case circumstanced as this is, the complainant, by the supplemental bill, has brought himself within the rule, which entitles him to demand relief. It will appear from that bill, that since the date of the contract, the value of the whole property has materially changed; and though time be not of the essence of a contract, yet it becomes material, where the circumstances of the party, or the value of the thing contracted for, have greatly changed. 6 Call R. 308. 3 Leigh, 161. 7 Yerger R. 365. 13 Vesey, 77. 4 Bro. Ch. R. 391.

I am satisfied, however, that this court, upon a further consideration of this case, will grant the complainant relief, because of the fraudulent conduct of the vendor. Any other principle of decision will invite men to the commisssion of fraud. Under the decision as heretofore made in this case, a vendor, with full knowledge of his want of title, or the defects in the thing sold, conceals them from the purchaser, saying to himself, if I sell this thing and the fraud be not discovered, I make handsome profit by my villany. If, however, it be discovered, I will remove the defect, and still hold the party to his bargain, and then, if my fraud is not found out, I get more than the article I sell is worth—if it be found out, I will, at any rate, get its value, and thus I cannot lose in either case. There is a game, I am told, called " heads, I win—tails, you lose," and with due deference, I consider the game Davidson has played upon Moss to be such an one—provided the court adhere to the opinion delivered by Judge Trotter. Such, however, cannot be the law—and, to sustain my position, I refer the court to the decision of the court of chancery of Great Britain, on a case similar to the one at bar. 1 Jac. & W. 120. *Dalby* v. *Pullen,* 4 Cond. Eng. Ch. R. 435. *Same* v. *Same,* 5 Ib. 14.

Even if it be true, that actual fraud must be accompanied with damage to the party, to entitle him to relief, I feel satisfied that the complainant would be entitled to it. For certainly a party has sustained damage, and that of no light character, who is compelled to employ counsel, and to engage in a tedious litigation before the conscience of his vendor was sufficiently awakened to do him the tardy justice of removing those clouds and incumbrances from the property, which were known to him but concealed from the purchaser. The question of damages cannot be considered in a case of fraud, and I conceive the concealment of defects in the title of an estate for a long time by the vendor, the purchaser being liable the whole time to an action by the true owner, of itself to amount to damage in contemplation of law, as much as the use of certain epithets in actions of slander import damage, and authorise the maintainance of an action without proof of special injury. In this case, by reason of Davidson's fraud, there was, in contemplation of law, no contract between him and Moss. It was void, *ab initio,* and being so, Moss has no occasion to ask the aid of this court to rescind that contract. He has a right to treat it as ended, and, doing so, this court cannot refuse him an injunction to stay any proceedings on this outstanding note, the same being void and without consideration, nor can this court refuse to order it to be delivered up and cancelled, and as an incident of that relief, having jurisdiction for one purpose, a court of equity will overhaul the whole matter and measure equity and justice to both parties.

I have heretofore argued this case upon the presumption that the title of Davidson to the slaves was now valid, and that the conveyance of his wife passed her interest in the estate; and when this case was heretofore before this court, I did not insist upon the invalidity of Mrs. Davidson's conveyance. Since then, I have had occasion to re-examine this subject, and I have satisfied my own mind, that a conveyance by a married woman of property conveyed to her separate use, can be made in no other way, than in the manner expressly given by the instrument of conveying her the property, and that where no mode of alienation is pointed out, she has no power to alien.

This is a question of great importance, and worthy the most attentive consideration. The decisions which have been made, both in Great Britain and the United States, have been so conflicting as to leave it, in my opinion, a question of reason and principle, rather than one of authority and precedent. As such I shall endeavor to treat it.

By the rules of the common law, the separate existence of the wife was entirely suspended during coverture, and during that state she had no power to bind herself by any contract. All personal property, too, which belonged to her at the marriage, vested instantly in the husband, and the dominion and control of the wife over it, were entirely taken away. The inevitable results of these rules soon became manifest, and parents, who in the confidence and cordiality of which the marriage of the daughter usually engenders towards the husband, had given handsome estates to their daughters, had, in too frequent instances, the melancholy prospect presented to them of their estates squandered and dissipated, and their daughters left destitute and in poverty, with no other maintainance than such as a drunken and worthless husband might choose to procure. Under such circumstances, recourse was had to the courts of equity, and a remedy was sought in the lieu of this serious evil. With what interest is a marriage settlement made? why is property limited to the sole use of the wife? Surely for no other purpose than to place it beyond the control and reach of the husband. If such be the object and intention of the grantor, is it not clear, that to authorise the wife to alien her interest when no such power is expressly given, is to defeat that object, and to place the wife and the fund intended to be secured to her entirely at the mercy of the husband? Who is there so ignorant of the human heart, as not to know that it is impossible for the wife to resist the solicitations of the husband, coming as they do in the guise of fondness and affection, and covered with the mantle of disinterestedness? Inasmuch, then, as the principal object of all marriage settlements or conveyances, by which property is settled upon the wife separately, is to withdraw that property from the dominion and control, and to place

beyond the reach of the husband, and as by the rules of the common law, a married woman had no power to make a contract of any kind, the inevitable conclusion to which the mind of every man would come, is, that the wife has no power to alien, or dispose of the property settled upon her, for her separate use, unless the power of appointment be expressly given.

Accordingly we find in the earlier cases, a doubt suggested, whether a *feme covert* could exercise a power of alienation expressly given, and the decisions of Lord Hardwicke went no further than to remove that doubt, and to settle that, if the power of appointment were given, she might exercise it as if sole.   See argument of A. M. Clayton, in case of *Morgan* v. *Elam*, 4 Yerger, 397.   I do not intend in this argument, to go through a labored analysis and review of the many conflicting and changing decisions of the English courts, but I apprehend that the result of the whole of them, will leave the question to to be decided as one entirely of intention and construction, and that instead of being regarded as a *feme sole* to all intents and purposes, she ought to .be deemed a *feme sole sub modo*, or to the extent of the power clearly given by the settlement.   4 Yerger, 375.   3 Johns. Ch. R. 77.   3 Dessaus. 427. In the settlement under review, the property is limited to the wife during the joint lives of her husband and herself, and if he dies before her, then to her absolutely.

Mr. Chancey lays down the rule to be, that if it be the intention that the wife should enjoy the property during coverture, and in the event of surviving the husband, that she should have the absolute property in the fund, without the power of alienation, the settlement should vest the property in trustees, for separate use during life, with directions, if she should die during coverture, that they shall transfer according to her appointment by will, but if she should survive, then that they should transfer to her, or her assignees.   Chancey on Rights, 306.   15 Vesey, 538.   The settlement under consideration, tested by this rule, clearly bars the wife from any power to alien during coverture.

It has been expressly adjudicated in Great Britain, in several

cases, which have never been contradicted, and Mr. Chancey adopts it as the law, that a settlement which limits the property to the wife absolutely, in the event of her surviving her husband, restricts her from alienating it, to the same extent as if express words of limitation or restriction had been used.

The first case settling this doctrine, and which was decided by Sir William Grant after great consideration and a careful review of all the authorities, is that of *Richards* v. *Chambers,* reported 10 Vesey, 579. In this case he lays down the rule that the wife " has no power of disposition over the contingent interests limited to her by the deed of settlement in event of her surviving her husband," and that having no power and " a legal incapacity to act," a court of equity has no power to authorize a conveyance of such interest, even on the joint application of herself and husband. The same question again arose in the case of *Lee* v. *Muggeridge,* 1 Vesey & Beames' R. 117, in which the court say that " an express provision that in the event of the wife's surviving, the property shall be absolutely hers, implies an exclusion of a power of appointing during coverture; so that it should not in that event belong to her." 1 Vesey & Beames' R. 122.

These decisions address themselves to our reason. They are in accordance with the clear and manifest intention of the parties to these settlements—are in accordance with the common law, power and authority of married women—were made after great consideration, and by a chancellor who had gone as far as any of his predecessors in treating married women as sole in relation to her separate property; and as they have never been overruled, are deemed by me as conclusively settling the construction of the fraud in accordance with them. The case at bar " runs on all fours " with both *Richards* v. *Chambers* and *Lee* v. *Muggeridge;* and if mistaken upon all the previous grounds in which I have asked a decision in favor of the complainant, I confidently claim upon the authority of those cases, settling as they do, the legal incapacity of Mrs. Davidson to convey the estate reserved to her by the marriage settlement, to the complainant.

*Lea* and *Lea*, for appellee.

On appeal from the chancellor's order dissolving the injunction granted by a circuit judge on the amended and supplemental bill, it is submitted that the order of dissolution was not erroneous, but should be confirmed for the following reasons :

1. None of the parties and none of the property in litigation belonged to the circuit of the judge who granted the fiat, as appears by the pleadings in connection with the known legal boundary of the circuit; so that he had no jurisdiction, either by the act of 1822 or that of 1841. And it is relevant and important to know whether a circuit judge can have equity jurisdiction even to grant an injunction as to any matter of value over $500. Amended *Const.* and *Const. Law of 1833.*

2. The injunction was issued on a fiat of a circuit judge after there had been a dissolution of the original injunction which covered the same ground.

3. The fiat of the circuit judge was granted on a paper purporting to be an amended and supplemental bill without any authority from the chancellor for filing such paper. Chancery Rule, 12. 6 Johns. Ch. Rep. 81.

4. The chancellor has never given leave to file the pretended amended and supplemental bill, and it is not legally on file so as to be the foundation of the process. Chancery Rule, 12.

5. This cause was before this court at January term, 1841, (in the style of *Davidson*, appellant v. *Moss*, appellee, reported 5 How. Rep. 673,) when the original injunction was dissolved on the same pleading and merits which were before the chancellor when he dissolved this injunction, and which are now before this court, unless the pretended supplement was properly before him on the last motion; but it had not been filed by the leave of the chancellor, and was not a part of the pleadings, so that the question before him was *res adjudicata* in the authoritive opinion of this court. Chancery Rule, 12.

6. If the supplement was properly before the chancellor, still the case was *res adjudicata,* for the merits were the same, and the dissolution was a necessary consequence; and this supplement, with the proceeding under it, amounts only to a second

application on the same ground for an injunction—a practice not to be tolerated. Compare the case in 5 How. Rep. 673, with the supplement.

Supposing the case now open for consideration as if it had not been previously decided—(the counsel of Moss requesting the court so to consider it, and thus arguing it)—the injunction was properly dissolved for various reasons, among which may be stated in the first place, that Moss has sustained no injury, and without injury a bill for rescission of a contract will not lie, even where there has been fraud. 1 Story's Equity, 212. *Bacon* v. *Bronson*, 7 Johns. Ch. R. 201. *Fellows* v. *Lord Gwyda*, 1 Sim. R. 63.

If the question for decision had arisen on any proceeding at the instance of Davidson, or necessary for him in the enforcement of his contract, the authorities adduced against him would be more appropriate; but this question arises directly on Moss's application for a rescission, which must stand or fall on its own merits, without being bolstered in any degree by the cross bill of Davidson, who has only endeavored to secure the property, that it might be forthcoming to answer his demand after the obstruction of Moss's bill shall have been removed. Neither the pending nor dismissal of Davidson's bill can affect the right to a rescission claimed by Moss. This difference of position affords an answer to all the authorities adduced to show that the court will not give its aid where it is a necessary means for accomplishing the purposes of a fraudulent vendor. And such are the cases cited.

But the question recurs on Moss's bill, what right has he to a rescission? He has not sustained any injury, nor has he any ground for apprehension. If he had any just apprehension, it was removed by the tender of the deeds from Davidson's wife and children before the filing of Moss's bill for a recision. These deeds are good for all possible outstanding title, and were so regarded by Moss and his counsel in the former stages of this case; but they are now questioned for want of consideration, and for want of power of appointment under the marriage settlement, as to the interest of Mrs. Davidson; and the following authority

is cited on the power of appointment. Chancey on rights of married women, 289 to 321.

To the foregoing authorities might be added others, and all would sustain the appointment made in this instance where the right is conferred without express power of appointment, and without any particular mode of enjoyment or disposal, leaving the power of disposal unrestrained in every particular.

And as to consideration, it is enough that Moss is not in a situation to inquire into it. It will be time enough for the court to hear a complaint on this subject, when it shall be made by the parties in interest. But, without proof to the contrary, a good or valuable consideration would be presumed, and especially among the members of a family.

But there is another view of these deeds, by which the right of Moss is shown to have been perfect at the time of his purchase from Davidson. These were executed by the *cestque trusts*, who therein admitted that the sale by Davidson, who was their trustee, was made with their consent or approbation. This admission was conclusive on all parties; not only when made, and when the deeds were tendered to Moss, who then had the makers estopped by their own deeds, but by relation to the orignal sale, which as a common act, done by one, could never be impeached by any.

8. It has been assumed that legal, if not actual fraud, may be imputed to Davidson—but this is not conceded. Actual fraud is denied in the answer, and this negation is confirmed by the whole history of the case. Soon after the marriage, when Davidson was advised by counsel that the marriage settlement was ineffectual—it was natural that all those interested should, by a family understanding, look to such equivalents as were satisfactory, on the one hand, while Davidson, by common consent, should dispose of the trust property as his own, regardless of the marriage contract supposed to be worthless. Not only the long acquiescence of all the parties, but their affirmative assent and approbation, adopting the original sale to Moss as their own act, shows a satisfactory equivalent; and that Davidson not only felt himself authorized, but was in fact authorized, to sell as he

did.  If the conduct of the parties precluded them from impugning the sale, the title of Moss was good from that time, and Davidson was not guilty of any fraud in fact or in law.

9.  Suppose, however, there was both fraud and damage, it does not follow, of course, that the contract will be rescinded in equity.   And in this case the bill should not be entertained, because an action at law is the proper remedy.   2 Story's Eq. 4, 5, 6–24, 26–47–79.   1 Story's Eq. 194.

By a suit at law, damages could be recovered and obtained; for it is not alleged nor intimated that Davidson is unable to pay; but by a rescission of the contract, the consequences will be accounts as to money paid—hire of these negroes and many others—rents of lands—compensation for improvements—of all which the disputed negroes form, comparatively, but a small part of the entire contract.

10.  This bill for a rescission should not be entertained; because Moss has not prosecuted this remedy with fairness and promptitude, nor shown his present ability to comply with the necessary terms in case of rescission.

*Howard,* on the same side.

1.  The answer denies the unsoundness of the two negroes which the bill alleges were unsound.   It states the boy to have been of a bad disposition, but to have been sound in the ordinary acceptation of the term.   It also states that the girl was weakly, but it does not appear that she was diseased.   It is obvious that the want of a robust constitution, or great strength, cannot constitute such an unsoundness as would entitle the vendee to an action, especially in the absence of any fraud.

2.  Fraud itself cannot be set up in bar of a recovery of the purchase money of a chattel, unless the vendee offer to return it, when he discovers the defect, or shows it to be of no value. 3 Wend. 236.   12 Wheat. 183.   6 Cond. Rep. 515.   Much less can he go into equity, without having first offered to return the property.   1 Litt. 279.   5 Howard, 387.

3.  The remedy of the complainant for the unsoundness of the slaves, was clearly an action at law on the warranty.   A

matter arising upon a false warranty, is certainly not a proper subject for equity jurisdiction. The chancellor would not entertain jurisdiction unless the complainant had alleged insolvency of the defendant, which has not and cannot be done. Had such an allegation been in the record, the chancellor could not have undertaken to assess the damages himself, but would send the question to a jury, and would only hold up the injunction for the verdict. 6 Dana, 33. *Stewart* v. *Chamberlain.* Neither can the court entertain jurisdiction on the ground of compensation or equitable set off. Uncertain damages are not the subject of a set off in equity. 3 J. Ch. Rep. 381. 4 Ib. 292. Unliquidated damages sounding in tort, are not the subject of a set off. 3 J. Ch. R. 575. Neither are unliquidated damages, arising from the breach of a covenant. 2 Edwards, 73.

4. As to failure of consideration in relation to the sixteen slaves, I presume the court will adhere to its former decision. 5 Howard. It would be difficult to find a case where a contract in relation to real estate and personal property can be rescinded because of a failure of title to part of the personal property, when it was not in the least necessary to the enjoyment of the residue, and did not in the least, as in this case, injure the object of the purchase. There is no pretence for saying the inducement to the purchaser of a plantation and a large number of slaves is gone, because of a failure of title to a portion of the slaves. It is a case of a plain and adequate compensation by an action on the warranty.

" When the object of a purchase is not defeated, and the purchaser is not injured by the contract being enforced, he cannot be permitted to abandon it." 2 Am. Ch. Dig. (by B. & Harrington) 563. 2 Har. & Gill, 390. 2 Randolph, 131.

5. But we say there has been no failure of title in this case; 1, because the statute makes all marriage deeds and settlements void as to purchasers without notice, unless acknowledged and recorded; and if the property is removed from the county of the record, a new record must be made in the county to which the property is removed. H. & H. 343, § 24.

Under the marriage contract, Davidson was the trustee by

operation of law. The legal title was in him. Moss, according to his own showing, was a purchaser without notice of the trust. 5 Dessaus. 87. Admitting that there was a failure of title, the defect has been obviated by procuring a conveyance from all the parties in interest. 2 Story's Eq. 88.

The beneficiary must elect, in cases of the sale of the trust property with notice, whether he will set aside the sale or take the substituted fund. In this case, we must presume the election has been to receive the purchase money. It is doubtful, therefore, whether there was ever any fraud in the case—certainly none of which Moss can complain. 2 Story's Eq. 506.

6. It is urged that although the objections to the title have been removed, that still, inasmuch as there was fraud in the re-representations of the vendor, the contract should be rescinded. The principle is well settled that, in order to entitle the vendee to a rescission of the contract on the ground of fraud, there must be damage coupled with it. 1 Story's Eq. 212. 12 East. 637–8. Eden on injunction, 27 (note) 4. Cond. Eng. Ch. Rep. 332. 1 Yerger, 289. 9 Cranch, 458.

Courts of justice deal only with the redress of injuries. They have nothing to do with abstract speculations upon ethics. A suitor must show that he is injured before he can be heard in any court of justice. Judicial tribunals are not mere casuists.

7. It does not require argument to show that the trustee need not formally accept the trust, or that the conveyance is valid if he refuse it, and that a court of equity will supply the defect by appointment. The question, however, does not arise in this case, as the deed is executed by two of the trustees, and either has power to sell under the deed. Besides, two are a majority, and might execute if the power were joint. 11 Wheat. 78. 6 Peters' Cond. R. 227. 3 J. Ch. R. 261. 4 Ib. 136. 3 Paige, 420. 5 Paige, 46. 2 Swanst. 370.

*Robert Hughes*, in reply.

1. The injunction should not have been dissolved by the chancellor, but should have been retained to the final hearing, and the order of dissolution should now be reversed.

Because a fraud was committed by Davidson in reference to the negroes embraced in the marriage settlement, by not at the time of the sale disclosing the fact that such a marriage settlement was in existence.

In the discussion of this question we do not intend to assert, that in all contracts or agreements, that the vendor of an article or of an estate, is bound to communicate all he knows in reference to the thing agreed to be sold. We take the distinction which is taken in the law books, that there is a difference between intrinsic circumstances, which belong to the nature, character, condition, title, safety, use or enjoyment, &c., of the subject matter of the contract, and intrinsic circumstances, such as are accidentally connected with it, and may or may not increase the value of the estate, such as the existence of peace or a state of war, a good market in the neighborhood, or the absence of such, high or low rate of taxes and the like. In reference to the first instances only, do we insist that it is the duty of the vendor to communicate to the purchaser; as to any such of which the vendor is informed, there is a moral, imperative duty to communicate them. If they are concealed, it is an undue concealment, (and which amounts to a fraud) in the sense of a court of equity. See 1 Story's Equity, 213 to 221.

There is a trust implied when one party deals with another, that the vendor has title to the property, and if he has not, it is his duty to make disclosure of his title. See Ib. 218–19. And see the opinion of the court in this case, 5 Howard, 681–2, &c. Sugden on Vendors, Amer. ed. 208, 320, 381.

The ground upon which the concealment in this case must be considered to be a fraud is, that Moss supposed he was buying the fee in the negroes in contest, when as was well known, and not disclosed by Davidson, he had no present interest whatever in the property, but was the trustee for the benefit of his wife and children, and had no future interest, but in the event that his wife should die in his lifetime, without children surviving her. If at the time of the making the agreement, Moss had been informed of this, he would either have refused to go on with the agreement, or he would have insisted upon some-

thing being done to remove the difficulty, or he would not have given the price charged for the negroes so situated. The thing not disclosed was an intrinsic circumstance, constituting a defect in the title, and one which the vendor was bound to disclose, and according to all the authorities it was a fraud, to the injury of Moss, because in his hands it lessened the intrinsic value of the property. The property was not worth as much by the difference of value between an indefeasible estate in fee, and an estate depending upon the will of Mrs. Davidson, for it was in her power at any time, and of Davidson's children, if Mrs. Davidson was the longest lived, to defeat the estate, by coming into a court of equity, and insisting upon the execution of the trust of the marriage agreement.

2. But it was insisted upon in the former argument, that Mr. Davidson committed no fraud; that if the thing upon its face appears to be a fraud, that no fraud was intended or in fact committed, because he says he never thought of the marriage agreement when negotiating with Moss, and to show that he intended what was fair, as soon as Moss threatened to file an amended bill, and set up the marriage agreement, he promptly obtained from his wife and children, who were the only persons who could, under any circumstances, claim the estate, conveyances. This might all do very well, were it not that it is not true, as can be shown by a short examination of the facts and circumstances. We admit it to be true, that Mr. Davidson has disclaimed all intention of fraud; that, in substance, he never thought of the marriage agreement when he was negotiating with Moss. But how does this negation stand with the statement under the hand and seal of both Davidson and wife, in the deed purporting, in 1840, to convey the property to Moss, (and which is the deed, which, according to the argument of counsel, is to place Davidson *rectus* in *curia*,) in which it is said, that the sale to Moss, and the deed of trust given to secure the purchase money, were all done with the approbation and consent of Mrs. Davidson? We think it very strange that Mr. Davidson should have forgotten the deed, and that it should not have been in his mind all the time he was dealing with Moss, yet that Mrs. Davidson

should have intimated her approbation, and given her consent to the sale, &c. It might have been true that Mrs. Davidson expressed her approbation of the agreement between her husband and Mr. Moss, without calling to Mr. Davidson's mind the marriage settlement, but it cannot be true, that she gave her consent to the sale, &c., without some remembrance being revived in the mind of that long forgotten and inoperative marriage agreement. The approbation must have been expressed, or the consent given to Davidson or Moss. It was not to Moss, and must have been so expressed and given to Davidson. To whom else was it given if not to Davidson? no other person had, or knew he had an interest in that approbation or consent but Davidson, because without it he was liable to be arrested in his proceedings, so that it must be either that the statement in the answer is untrue, or that in the deed; if that in the deed, then his conduct is not clear of the fraud, upon the ground upon which he wishes to place it; if the statement in the deed be untrue, then his wife has been induced to agree to the deed, upon a statement which is untrue, and in reference to which something else may hereafter be said.

We cannot, however, admit the statement in the answer to be true; we are willing to go as far as we can, and admit that he did not think the marriage agreement would effect the title of Moss, and we must believe that he conversed with his wife about the sale to Moss, and we can but believe, also, that Moss would eventually have lost the property after the death of Davidson, if not before, after the payment of all the money, if the fact of the existence of the marriage agreement had not been discovered, and the great haste evinced by Mr. Davidson four years after the agreement was made, to procure the conveyance from his wife and children, is any thing but evidence of fairness, and the absence of an intention to commit a fraud. The negroes were sold for $1000 and $500 each, those in contest amounting to about or more than $11,000. The price had fallen at least one half, and unless the agreement could be executed, as to said negroes, he would be compelled to take them back, at the price at which they were sold, and thereby would lose five

or six thousand dollars.  A very important matter!  Therefore was he in a hurry; but in his haste he has disclosed the facts before referred to, and by them we wish him to be judged.

2 Now what is the result of the fraud; what decree will the court pronounce?

It has been shown that a fraud was committed in the sale; upon this the court, in the former opinion, has said, that no principle " is better established, than that fraud vitiates every contract, and so renders it both void at law and in equity." See 5 How. 683.

And Mr. Justice Story says, in reference to a concealment of the kind under discussion, it would clearly avoid the sale on the ground of fraud.  See 1 Story's Equity, 218, 219.

Again he says, " courts of equity will not decree the specific execution of a contract in case of fraud."  See 2 Story's Equity, 79.

The bill was filed by Moss for an injunction upon the ground that a fraud was committed; to this the defendant answers that a fraud was not committed, and he makes his answer a cross bill, and insists by his cross bill that the agreement be enforced, because now that has been done which he tried at first to do, that is, by conveyance, make the title perfect in Moss; and to this conclusion this court came on the former argument, and so gave an opinion.  5 How. 684.

This opinion we respectfully ask leave to combat.  The opinion in this part of it rests upon the ground, that in agreements in equity, " time is not of the essence of the agreement," unless it be so made by the agreement, or the facts and circumstances with which the case is surrounded.  This principle is admitted to be true, but we insist it has no application to this case.  The rule is never made to apply to cases of fraud, nor can a case be found in any book of respectacle standing, that it once has been held, that where a party has sold property, representing that he has title, and that representation has been relied on, or where he has concealed material circumstances, showing a want of title, or incumbrances, and a bill has been filed to rescind upon that ground, and the fraud has either been

admitted or proven, that the court has refused the relief asked, by rescinding the agreement, and decreed a dismissal of the bill or an execution of the agreement, because after the fraud has been discovered, the title has been procured and rested, in the purchase, or the concealed incumbrances removed.

The cases referred to in support of the opinion of the court, are none of them cases where a bill has been filed to rescind upon the ground of fraud, and where the rule has been laid down which has been insisted upon. But they are statements of the application of the rule, to cases where there is a defect of title or incumbrances, without fraud, which has been perfected or removed, and time not being of the essence of the agreement, the contract then enforced.

The first cases referred to, are those which are found in Sho. & Lef. 347, Ib. 684, and they settle nothing but that when a party by his own default, has lost his remedy at law, he may come into a court of equity and obtain a specific execution, if it be conscientious to enforce the agreement.

The next case refered to, is that of *Garnet* v. *Macon*, 6 Call, 684. This case is said to be like the one at bar, except that it was an executory contract instead of an executed one, and the estate sold was equitably charged with the payment of debts, the knowledge of which did not come to the vendee, until between the making of the agreement and the time for its execution. It is respectfully submitted that there is another difference, and one, too, which places it on a ground entirely different from that on which the case at bar rests, which is, that there is no allegation of fraud whatever, but merely an averment that the incumbrance in question was not discovered until after the making the agreement. The purchaser was informed of incumbrances, but not of the particular one in question. This particular allegation was not proved; but because the incumbrance insisted upon did exist, and could not be removed, and for that reason only, the court discussed the bill, and refused by decree to enforce the agreement.

The case of *Hepburn* v. *Auld*, 5 Cranch, 262, was also a case of a bill filed for the specific execution of an agreement, and

the only question for the consideration of the court was, whether the vendor could make a good title, and because on that question they thought he could not, a decree was rendered dismissing the bill.    There was no question raised as to fraud.

The case of *Brashier* v. *Gratz*, 6 Wheaton, 528, has no application to this case, that can be seen by the counsel for appellant. In that case, the relief asked by Brashier, was refused on the ground that he had been guilty of laches, and thereby had placed himself and the other party in a situation where, in consequence of a change of circumstances, it would be inequitable to enforce the agreement, and although in that case, as in other cases, the rule is laid down " that time is not generally of the essence of the contract," in that case it was, and the bill was dismissed.

From this review it results that the cases referred to have no application to the case at bar, and so will it be found by a reference to all the cases where the agreements have been enforced, on the ground that time was not of the essence of the contract.

But it is said no damage has been sustained, and, therefore, Moss now being where he was by the agreement, as originally executed, to be placed, that we have nothing to complain of, and the agreement should now be enforced by dissolving the injunction, and the case of *Boyce's Exec.* v. *Grundy*, 3 Peters, 210, and 2 Story's Equity, 212, and the case *Bacon* v. *Brown*, 7 Johns. Ch. R. 201, are cited.

A few observations will suffice for the case of *Boyce* v. *Grundy*. The bill was filed to rescind the agreement, for a defect of title, and on that ground the bill would have been sustained; it was also filed to rescind on the ground of fraudulent misrepresentations.    The counsel for Boyce argued, that the misrepresentation, if at all established, was but of a personal character, and susceptible of compensation or indemnity, to be assessed by a jury.

On which the court observe, that if the facts made out such a case, yet the law, which abhors fraud, does not incline to permit it to purchase indulgence, dispensation, or absolution.    As to

the reference to 2 Story, 212, it is true that there must be a loss or damage sustained, or supposed to be sustained. It will not, however, do to permit the principle laid down by Judge Story, to be applied to a case where a fraud has been committed, and thereby permit the perpetrator of the fraud, by a new agreement vesting the title in his vendee against his consent, to purchase absolution, and thereby prevent the injury and save his money at the same time.

The case in 7 Johns. Ch. R. is but the recognition of a well settled principle, but has no application to this case.

In conclusion, will it be permitted to any one, to make contracts at his pleasure, without title, representing that he has title, or so acting as to induce the belief that he is the owner of the estate, pocket the money, and then turn round and say, I had no right to the estate sold, and I knew it? I committed a fraud, but since I sold to you, I have bought up the title, and I now have it in my power, and will make you a good title. Will experiments of this kind be permitted with estates of others?

But suppose the court are right in the application of the rule insisted upon, to cases of fraud, and to executed contracts or agreements. Then we insist that the amendment in the court below, brings us within the limitation of that rule, that is, where there is a change of circumstances, the agreement will not be enforced. If the agreement is enforced, what will it be but making a new agreement? By reason of the fraud, the old agreement as to the negroes in contest, was void, and of no effect—in fact, no agreement was made. Now it is proposed to make an agreement, and Mr. Davidson, at this time, wishes to make an agreement on the terms upon which the former agreement was made. To this, we reply, not agreed; then the negroes were worth $1,000 and $500 each; now they are worth not more than half that amount, and therefore we will not agree at all.

But we do not think it true that the title is complete in Moss by the conveyance from Davidson and wife, executed in 1840.

Now what is that deed? It is what purports to be a declaration of title in, and transfer of property, to Moss, on the terms set out in it; and there is no consideration in fact or in law, pass-

ing from Davidson or from Moss. True, one is attempted to be set out; but about that as before insisted upon, either the statement is untrue, or if true, then we now insist that that consideration at the time, did not move to Moss or from him. Moss knew nothing of it, and could not and cannot have the benefit of it.

The deed, if there be any consideration for it, is upon an executed or past consideration, between Davidson and Moss—such is not a good consideration upon which to pass the title to Moss from Mrs. Davidson. See 5 Johns. R. 277. Fonb. Eq. Am. ed. 255.

Has the title or right to the property which was in Mrs. Davidson, vested in Moss, by the deed under discussion? It is submitted it has not, because of the familiar principle, that there *must be two parties to* every agreement of transfer—a bargainor and bargainee, a vendor and vendee—a person to give, and one to receive. Mr. Moss has never agreed to receive, on the contrary he has objected to it. The matter, then, is in *fieri*. It is yet to be done. In this view of the question, how does the matter stand? The aid of a court of equity is asked, to compel Mr. Moss to receive the conveyance from Mrs. Davidson, of her separate estate, to inforce an agreement about the estate, between Moss and Davidson. On what terms and under what circumstances will this be done?

We admit the doctrine to be, that when there is an agreement before marriage, between husband and wife, that the wife shall have personal property to her separate use, she may dispose of it by act in her lifetime, or by will. *Peacock* v. *Monk*, 2 Vesey, sen. 290.

Again, where anything is settled to the wife's separate use, she is considered as a *feme sole*, and may appoint in what manner she pleases, and the wife may make an appointment in favor of her husband, if fairly procured, without improper influence. *Gregby* v. *Cox*, 1 Vesey, sen. 577.

Between husband and wife, the courts will scrutinize the transaction with a jealous eye, in order to protect the wife against undue influence. *Jaques* v. *The Methodist Episcopal Church*, 17 Johns. 589.

The substance of these authorities is, that a wife, in reference to her separate estate, is considered a *feme sole*, and may do any act which as *sole* she might do.   But in transactions between husband and wife, the court will see that undue and improper influence is not exercised over her.   In other words, when an application is made to a court of equity, to give effect to a transfer of the separate estate of the wife, the court will see that she has voluntarily done what is attempted to be set up—that every thing is fair and right.

We ask the court to do this in this case, because the court can and must see that there is something wrong in the matter, as before insisted upon ; either Mr. Davidson's answer is untrue, or by improper and undue influence, Mrs. Davidson has been induced to make an untrue statement in a matter forming the consideration of the deed, which is said to pass the title.   Will the court give effect to this deed, with this fact standing out in bold relief?   Is there not something " rotten in Denmark ?"

*Lea* and *Lea*, by permission, made the following additional argument.

The views heretofore submitted, on the deeds from Davidson and wife, and his children, are predicated on the supposed efficiency of the marriage contract in all its provisions.   But these views may be materially modified and strengthened, if it shall appear, on examination, that no interest ever can be vested under the marriage contract, except the use to Mrs. Davidson during the joint lives of her and husband.   To show this, a few remarks, with authorities, are now submitted.

It is a fundamental principle, that there must be a person seised of the legal estate to the contingent use when the contingency happens, or the use cannot vest—and herein such use differs from an executory devise.   The former depends on a subsisting legal estate, to which it is incidental—but the latter may rest on the grant.   A possibility—a scintilla—an abeyance, will not prevent the failure of a contingent use, but there must be a present legal estate vested in some person *in esse*.   In other words, the legal estate and the use must have unity of time,

when the use is to vest.   A remainder, whether certain or contingent, whether in possession or in use, must succeed the particular estate—the one ending where the other begins—there being no difference in this respect between common remainders and those in use—but a contingent use, whether in remainder or not, must, at the commencement, rest on a legal estate then existing, not on one which had existed before as a preceding estate, and as a previous part of the same thing, but on one coexistent, as contradistinguished from preceding—a present modification of the same thing—between which and a particular estate preceding a remainder there is the difference, which obtains between the past and present, utterly divided as well by a line as by a year of time, without even a shading of common identity. 1 Rep. 134, 138.   Cro. Eliz. 439.   2 Bl. Com. 334, 171.   4 Kent's Com. 295.   Cornish on Uses, 129 to 141, in the Law Library, vol. 1.   2 Roll. abr. 769.   2 Sid. 64.

If it has been shown, that a subsisting legal estate in some person *in esse* is necessary at the vesting of a contingent use, it only remains to show the want of such legal estate at the appointed times for the springing of such uses under the marriage contract in question.   By this contract the legal estate is conveyed to " Richard Davidson, his executors, administrators and assigns," and these words give him the whole legal estate in the slaves, as if the conveyance had been to him without the words " executors, administrators and assigns," which neither diminish nor augment his legal estate, while they give no prospective right to take under the terms of the grant.   And a trust estate in personality goes to the personal representative.   These principles are familiar.

Under this deed the springing use to Mrs. Davidson is contingent on her surviving her husband; but the termination of his life must be the termination of his legal estate, so that the use cannot vest for the want of a subsisting legal estate in some person *in esse*, according to the principles already stated.   Nor is the difficulty obviated by supposing that a personal representative will exist at some future period to take the legal estate, for such possibility is not sufficient to sustain the use, as has been already shown.   So the case would stand without an alienation

by Mr. Davidson ; but an alienation by him would, of course, preclude his personal representative from taking—and such alienation has in fact taken place.   His death, therefore, must consummate one mode of terminating the legal estate, so as to defeat the contingent use.   But the alienation presents an additional substantive mode in which the legal estate has been terminated.   The sale to Moss accomplishes this, *ipso facto.*

The equities, which may be asserted under some circumstances as to trusts, cannot defeat the power of the trustee to alienate the legal estate in a case of contingent use.   Nor is it competent for third persons to question such an alienation, especially when the usee acquiesces, and more especially when he is estopped by deed.   The authorities heretofore cited are here relied on, and also the following—Wills on Trustees, 133, in Law Library.

The contingent use to Mrs. Davidson's children is in like predicament with that to Mrs. Davidson.   That intended for Mrs. Davidson's children is out of the case for want of present existence or possibility of such takers.

The intended use to Mr. Davidson in case of his surviving his wife, is superseded or merged by his possession and marital rights.

The result would seem to be, that there is no effective right under this marriage contract, except the present vested use of Mrs. Davidson, during the joint lives of her and husband ; and this she has an unquestionable power to alienate (the property being personal) by deed, or other writing, or by parol, in any way that a *feme sole* might, even by delivery in person, or by proxy, or by acquiescence in the act of another.   As to original acquiescence and consent, as well as any future right, she is estopped by the recitals and terms of her own deed, which no other person has a right to gainsay.   There was no fraud in the sale—no consequent injury.

*W. Yerger,* in reply.

Since the argument of this case, the counsel for defendant have prepared an additional argument, in which they contend that the contingent limitation to Mrs. Davidson is void ; because,

say they, as the estate is not to arise but upon the contingency of her surviving Davidson, that very provision defeats the use, because Davidson being feoffee to the use, and being dead before the contingency arises, the use is destroyed forever, inasmuch as there must be a person seised to the use, when the contingency happens, or the use cannot be executed. The first and most obvious answer to this position is this—By the conveyance the whole fee at law in the property is cast upon Davidson, subject to the trusts of the settlement. At his death, that ʰestate is vested in his executor, or administrator, who will be compelled to execute the trust. Willis on Trustees, 53. Ib. 145. Note R.

If Davidson should appoint an executor, the estate would vest in him, *eo instante*, of the death of Davidson. If he should appoint none, the legal estate would remain in abeyance or in *fieri;* till the appointment of an administrator, when it would vest in him, by relation, from the death of the testator.

In this particular case, however, as the whole legal estate was in Davidson subject to the trusts of the settlement, and as Davidson has aliened this estate to Moss, who according to law has constructive notice of the settlement, should Moss be compelled to abide by the contract, the very sale itself will uphold the contingent use in the event Mrs. D. survived.

A purchaser, with notice of a trust, comes in privity with the same estate the trustee had, and takes it subject to the trust. In the contemplation of law, Moss had this notice, and if the sale be upheld the case will stand thus, admitting the applicability of the doctrine contended for.

To support the contingent use to Mrs. Davidson, when that use arises, there must be some person seised to the use, or in the language of gentlemen, the legal estate must be in some one. The whole fee at law was in Davidson—he has sold to Moss—now on the death of Davidson, Mrs. Davidson surviving, Moss will have the legal estate in him, and having bought with notice, holds subject to the trusts of the settlement, and is consequently feoffee to the use, or seised to the use, when the contingency happens by which the contingent use is to arise.

So that the very effect of upholding the contract, will be to pre-
serve the contingent use, which might by possibility have been
destroyed by the death of Davidson, without any legal represen-
tative, according to the argument of counsel. However, I
consider this whole doctrine as much too refined to apply to the
trusts created by a marriage settlement, which a court of chancery
will execute according to the intention of the parties, and would
not permit to be destroyed for want of a trustee. The whole doc-
trine of counsel will be destroyed by a single glance at this set-
tlement, from which it will be seen, that the legal and equitable
estate, both will vest in Mrs. Davidson at the death of her hus-
band, she, him surviving, and that there is, consequently, no
occasion for a trustee to preserve the contingent use or limita-
tion.

Mr. Justice CLAYTON delivered the opinion of the court.

This is the same cause which was formerly in this court be-
tween the same parties, reported in 5 Howard, 520. After that
decision a supplemental bill was filed, which contains no new
statement nor the averment of any fact which was not fully
known to the complainant and his counsel, before the case was
then determined. Another injunction was obtained. One of
the principles laid down in the opinion of the court is, that
" fraud without a consequent damage, can give no ground for
an action, or to be relieved from the contract," and as there was
no evidence of damage in the case, the injunction which had
been granted was dissolved. The present bill was filed to show
that there had been damage, because of the great depreciation in
the market price of slaves subsequent to the purchase of the
complainant. The injunction was dissolved in the chancery
court, and an appeal taken by the complainant.

It has been questioned in the argument, how far the complain-
ant had a right to file this bill, and again restrain the defendant
from proceeding under his deed of trust. A sage maxim of our
law warns us, "that it is to the interest of the State that there
should be an end of litigation." Every party is therefore
required, in the first instance, to unfold his whole case, and put

it in that condition in which he is willing to abide by it. But as mistake, accident and other causes may often render the first statement imperfect and incomplete, amendments are freely and liberally allowed to the very moment of trial. Any extension of the rule beyond this limit would be fraught with danger. The party might take his chance, and, after an adverse decision, might renew the litigation—not because of any recent discovery of evidence, or development of new facts, but because he failed to prove facts which he knew existed, and which, if established, might have changed the result. If this latitude is indulged in, an endless round of controversy would be the probable consequence. In reply to this it is said, that the counsel for the defendant should have moved in the court below, to take the bill from the file. This may be so, and as the case has been argued here on its merits, we shall proceed to dispose of it without further notice of this point.

The counsel for the appellant argue, that the principle of the former decision, which we have above set out, is erroneous; and that every fraud in itself imports a damage which vitiates the contract, and gives just cause for relief. This has induced us to review the former decision with increased care and anxiety, because we are solicitous that our opinions should do justice between the parties, and stand upon correct legal principles. The cases are numerous, and from their very nature incapable of the precision and certainty desirable in all legal investigation. It has been observed that it will not do to fix with definiteness the bounds and limits of relief against frauds, lest the inflexible character of rules thus established, should be so perverted as to be made to minister to fraudulent ends. No general and uniform rule seems to be deducible from the cases taken together, and they tend to leave the judgment unsatisfied and embarrassed by their want of harmony and consistency. From the review thus taken we are not prepared to recede from the former opinion of the court; nor is it necessary that we should reiterate it, because there is another ground, in which we have entire confidence, on which our judgment may rest.

Beyond all doubt a complainant, who has purchased property,

received a conveyance, and has taken and enjoyed undisturbed possession, must, in his bill, show clearly the defect of title, or the fraud which he alledges to exist, if he seeks to rescind the contract. He cannot ask the vendor to deduce his title; it is for the vendee to prove the defect, and if none be shown by him he is entitled to no relief. *Grantland* v. *Wight*, 5 Mun. 295. 2 Rob. Pr. 190.

Tried by this rule the complainant has failed to make out a case for equitable relief. The outstanding title which he attempts to establish, is a marriage contract between Davidson and wife, made in the year 1824, and recorded in the county of Jefferson. By the statute of 1822, a deed of personal property required to be recorded, must be recorded in that county in which the property remains; and if it be removed to a different county, the deed must be recorded there within twelve months, or the same is void as to all purchasers thereof for valuable consideration without notice, and as to all creditors. The marriage settlement, to be valid, must have been properly recorded in every county in which the property remained for twelve months, but the bill does not aver that this was done. It does not very distinctly appear from the proceedings, whether the negroes were removed to Rankin county or not, before the purchase of Moss, but the fair inference is that they were. Davidson, at the time of the sale in 1836, resided in Rankin; the slaves were then conveyed; they were re-conveyed by deed of trust, and that deed recorded in Rankin county. They remained there till 1840, up to which time the marriage settlement had never been recorded in that county, as is fairly to be presumed, because both parties have exhibited a copy, and both are taken from the record in Jefferson. This creates a fair presumption that the negroes were removed from Jefferson, and that the deed of settlement had never been recorded in Rankin. The complainant, then, so far from showing that there is a substantial defect of title, has shown *prima facie* that it is good, by reason of a want of proper registration of the marriage agreement. Davidson was rightly advised that the marriage agreement did not stand in the way of his title, the sale was not affected by fraud, and there is no reason exhibited for a rescission.

Perhaps it may be said, that although there was no fraud at the time of the sale, yet if the purchaser had notice at any time, before payment of the purchase money, he is affected by it. This may be true, if it be notice of an actual outstanding title, which the party who owns it desires to enforce. The marriage agreement came to the knowledge of Moss in 1840, about four years after his purchase. It was certainly competent to the legislature to pass the act of 1822, and to make it operate upon the titles of infants and *femes covert*, as well as upon those of persons able to act for themselves. There is no saving in their favor, and the court can make none. At the time Moss heard of the marriage agreement, if the purchase money had all been paid, there could have been no doubt of the validity of his title. The marriage agreement could not operate upon his title, because not recorded. Mrs. Davidson gives him no notice, but Moss hears of something which puts him upon inquiry—all the parties concerned disclaim any interest, and for his greater security relinquish all right. The *feme covert* acknowledges the relinquishment upon a separate examination from her husband. Of what then has Moss notice—certainly of no more than this, that Mrs. Davidson once had title under the marriage agreement, but that she had chosen to abandon that title, first by withholding the agreement from the record, and next by relinquishing that title when called on to know if she would èven assert it.

A court of equity, under these circumstances, would never permit her to set it up against the purchaser. Her right to go against the husband for an equitable settlement, as an equivalent, is another consideration, with which we have no present concern.

The difference between the present case, and that of *Palmer* v. *Cross* et al., is this. Here the rights of the wife, under the marriage agreement, had been destroyed by her failure to comply with a statute to which she was subject; there the rights of the wife were in full force, as she had not been deprived of them by any statute. In the one case it required some action on her part to be restored to rights already gone in a great degree, and only to be recovered by asserting them; in the other, the rights

were in full force, and not to be lost without some act of her own. In this juncture the one took no steps to enforce her rights, but in the most solemn manner demonstrated that she had wholly abandoned them; the other did no act which can justly be construed to her prejudice, and left her claims to be determined by the laws. The one still abides by the election she made to surrender her claim to her husband—the other resorted to the courts of the country to establish rights which she insists were never impaired or relinquished. On this distinction the two cases rest. In neither of them have we deemed it necessary to enter upon the consideration of the vexed question of the powers of a married woman over her separate estate; whether they be commensurate with those of an unmarried woman, or limited strictly to those conferred by the settlement.

Upon the whole, we approve the order of the chancellor dissolving the injunction, and direct that the same be affirmed.